UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

OLD NATIONAL BANK,                          )
                                            )
        Plaintiff,                          )
                                            )          **08-80078**
vs.                                         )
                                            )   Case No: _____
GOLDBERG & ASSOCIATES, LLC and              )
STEVEN D. GOLDBERG,                         )
                                            )   CIV-MIDDLEBROOKS
        Defendants.                         )
                                            )   MAGISTRATE JUDGE
                                                JOHNSON

FILED by _____ D.C.
INTAKE
JAN 24 2008
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. • FT. LAUD.

## COMPLAINT

Plaintiff, OLD NATIONAL BANK, by and through undersigned counsel, sues Defendants, GOLDBERG & ASSOCIATES, LLC and STEVEN D. GOLDBERG and states:

1.  Plaintiff, Old National Bank ("Old National"), is a national bank with its principal place of business in Evansville, Indiana. For purposes of diversity jurisdiction, Old National is a citizen of Indiana.

2.  Defendant Goldberg & Associates, LLC ("Goldberg LLC") is a Florida limited liability company, with its principal place of business at 653 Northwest 38 Circle, Boca Raton, FL 33431.

3.  Defendant, Steven D. Goldberg ("Goldberg"), is a natural person domiciled in Palm Beach County, Florida.

### JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and both Defendants and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

FTL:2526235:1

5.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because: the defendants reside in this district; a substantial part of the events giving rise to this claim occurred in this district; and the property which is the subject of this litigation is situated in this district.

## BACKGROUND

6.     Old National is a banking institution engaged in making loans to various persons and entities, and as such, Old National owns a number of accounts related to consumer debt, including delinquent accounts receivable.

7.     In October 2007, Old National contracted with an agent, Garnet Capital Advisors ("Old National's Agent"), to market 8,779 of Old National's delinquent accounts receivable (the "Accounts") to prospective debt buyers.

8.     In connection with soliciting bids for the Accounts, Old National's Agent provided to Goldberg LLC and other prospective buyers an electronic file in "masked" form (the "Masked File"). The Masked File contained limited information about the Accounts such as account number, balance, and last payment date, and it indicated the availability of (or lack of) identifying information for the consumer-debtors, such as names, addresses, telephone numbers, birth dates, and social security numbers. The Masked File did not, however, actually include this identifying information.

9.     The purpose of "masking" this electronic data during the bidding phase was two-fold. First, it protected the confidential consumer information from Goldberg LLC and other prospective buyers who had no ownership or other interest in the Accounts. Second, it protected the value of the asset because, without identifying information, Goldberg LLC could not re-sell the Accounts or otherwise attempt to collect on the Accounts.

10.     Prior to receiving a Masked File, each of the prospective buyers signed a confidentiality and non-disclosure agreement with Old National's Agent. Goldberg LLC signed

FTL:2526235:1

the confidentiality and non-disclosure agreement on October 20, 2005 ("Confidentiality Agreement"). A true and accurate copy of the Confidentiality Agreement is attached hereto as **Exhibit A** and incorporated herein.

11.     Old National was a third party beneficiary of the Confidentiality Agreement wherein it is referred to as a "Seller." (Confidentiality Agreement, ¶ 9.)

12.     An electronic file with all of the available consumer data in "unmasked" form is an "Unmasked File." Pursuant to Old National's procedures, an Unmasked File was not to be provided to potential buyers; it was only to be provided in conjunction with the closing of the transaction under an executed purchase agreement. It was not, however, provided to potential buyers except in connection with a completed sale.

13.     Goldberg LLC and Goldberg submitted the highest bid for the Accounts.

14.     On or about December 12, 2007, Old National and Goldberg LLC executed a Purchase and Sale Agreement (the "Purchase Agreement"). A true and accurate copy of the Purchase Agreement is attached hereto as **Exhibit B** and incorporated herein.

15.     Pursuant to the Purchase Agreement, Goldberg LLC promised to pay $294,435 (the "Purchase Price") to Old National on or before December 14, 2007. (Purchase Agreement, Article I and § 2.4.)

16.     At the time that Old National and Goldberg LLC executed the Purchase Agreement, Goldberg and Goldberg LLC secretly intended not to fulfill the promise to pay the Purchase Price. Instead, Goldberg and Goldberg LLC intended to gain access to the Account information in both masked and unmasked form and to use this information for fraudulent purposes.

17.    In exchange for the Purchase Price, Old National agreed to sell and transfer to Goldberg LLC all of its rights, title and interest in each of the Accounts. (Purchase Agreement, § 2.2.)

18.    Goldberg LLC failed to pay the Purchase Price on or before December 14, 2007, and the Purchase Price remains unpaid as of the date of the filing of this Complaint.

19.    During the week of December 17, 2007, Goldberg LLC (through Goldberg) contacted Old National's Agent and stated that Goldberg LLC was ready to close the transaction.

20.    During the week of December 17, 2007, Goldberg LLC (through Goldberg) stated, however, that it needed an Unmasked File for the Accounts before it would wire the Purchase Price to Old National.

21.    Subsequent to December 20, 2007, relying on Goldberg's representations, Old National's Agent sent the Unmasked File to Goldberg LLC.

22.    Goldberg LLC again failed to pay the Purchase Price.

23.    On December 28, 2007, Old National's Agent learned that Goldberg was soliciting buyers for the Accounts when it received an e-mail from a debt-broker named Brian Acker at Commonwealth Financial Group LLC offering to sell the mortgage deficiency portion of the Accounts and attaching an electronic file listing the mortgage deficiencies. This electronic file, however, had altered dates concerning the delinquency of the loans.

24.    On January 9, 2008, Old National was contacted by a debt-buyer in Evansville, Indiana that had been solicited to purchase a portion of the Accounts. Again, the delinquency dates on the loans had been altered.

25.     Unbeknownst to Old National at the time, on December 17, 2007, Goldberg and Goldberg LLC sold a portion of the Accounts related to automobile loans to Noram Capital Holdings, Inc. ("Noram") for $440,000 (the "Resale Proceeds").

26.     Goldberg and Goldberg LLC have retained the Resale Proceeds or diverted the Resale Proceeds to other uses, even though Old National was not paid for the Accounts.

27.     By e-mail to Goldberg in early January, 2008, Old National confirmed that the right of Goldberg LLC to purchase the Accounts had expired and that Old National did not want to do business with Goldberg LLC.

28.     By letter dated January 11, 2008, Old National demanded that Goldberg LLC cease and desist any efforts to market, sell or collect on the Accounts and that Goldberg LLC return all information related to the Accounts (the "1/11/08 Letter").

29.     Goldberg LLC has failed and refused to return the requested information to Old National.  Although Goldberg LLC claims that it destroyed this information, it has provided no independent verification of such destruction.

30.     Old National has retained undersigned counsel, and it is obligated to pay their reasonable attorney's fees.

31.     All conditions precedent to this lawsuit have been performed, satisfied or waived.

### PIERCING THE CORPORATE VEIL

32.     Defendant Steven Goldberg dominated and controlled Goldberg LLC to such an extent that the company's independent existence was in fact non-existent and that he was in fact the alter ego of the company.

33.     The company-form has been used fraudulently or for an improper purpose.

34.     This fraudulent or improper use of the company-form has caused injury to Old National.

FTL:2526235:1

5

35.     Goldberg LLC and Goldberg  are liable for punitive damages pursuant to the criteria set forth in Florida Statute Section 768.72.

### COUNT I - RESCISSION (Indiana law)

36.     Old National re-alleges paragraphs 1-35 above as if fully set forth herein.

37.     Old National and Goldberg LLC are parties to the Purchase Agreement.

38.     Old National entered into the Purchase Agreement based on Goldberg's and Goldberg LLC's false representations that Goldberg LLC intended to pay the Purchase Price.

39.     Old National has rescinded the Purchase Agreement and provided notice of this rescission to Goldberg LLC.

40.     Old National has not received any benefits under the Purchase Agreement.

41.     Old National does not have an adequate remedy at law.

WHEREFORE, Old National demands judgment against Goldberg LLC to rescind the Purchase Agreement, for preliminary injunction and injunction to order Goldberg LLC to return all information and documents related to the Accounts, order Goldberg LLC to reimburse Old National for any diminution in value to the Accounts caused by Goldberg LLC's conduct, award prejudgment interest, costs, and award such further relief as this Court deems just under the circumstances.

### COUNT II – UNJUST ENRICHMENT

42.     Old National re-alleges paragraphs 1-15, and 17-35 above as if fully set forth herein.

43.     Goldberg LLC promised to pay the Purchase Price to Old National.

FTL:2526235:1

44.    Old National and Old National's Agent conferred a benefit on Goldberg and Goldberg LLC (namely, transferring the Accounts and unmasked data relating to them) who had knowledge thereof.

45.    Goldberg and Goldberg LLC voluntarily accepted and retained the benefit conferred by Old National without paying the Purchase Price.

46.    Under the circumstances, it would be inequitable to allow Goldberg and Goldberg LLC to retain these benefits without paying for them.

WHEREFORE, Old National demands judgment against Goldberg LLC and Steven Goldberg for compensatory damages, prejudgment interest, costs, and for such further relief as this Court deems just under the circumstances.

### COUNT III – BREACH OF CONTRACT-Purchase Agreement

47.    Old National re-alleges paragraphs 1-15 and 17-35 above as if set forth herein.

48.    The Purchase Agreement constitutes a valid and enforceable contract.

49.    Goldberg LLC materially breached the Purchase Agreement by failing to pay the Purchase Price to Old National.

50.    Old National has suffered damages as a result of Goldberg LLC's material breach of the Purchase Agreement.

WHEREFORE, Old National demands judgment against Goldberg LLC and Steven Goldberg for compensatory damages, prejudgment interest, attorneys' fees pursuant to Section 13.10 of the Purchase Agreement, prejudgment interest, costs, and for such further relief as this Court deems just under the circumstances.

### COUNT IV – FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

51.    Old National re-alleges paragraphs 1-35 above as if fully set forth herein.

52.     Goldberg and Goldberg LLC committed deceptive acts and/or unfair practices by falsely representing to Old National and Old National's Agent that Goldberg LLC intended to pay the Purchase Price under the Purchase Agreement in order to obtain Old National Bank's Accounts and unmasked data related to them without paying for them and thereafter using unlawful means to market and purport to re-sell the Accounts.

53.     As a result of Goldberg and Goldberg LLC's deceptive acts or unfair practices, Old National has suffered damages.

WHEREFORE, Old National, demands judgment against Goldberg LLC and Steven Goldberg for compensatory damages, punitive damages, attorneys' fees pursuant to Fla. Stat. § 501.2105, prejudgment interest, costs, and for such further relief as this Court deems just under the circumstances.

## COUNT V – CONVERSION

54.     Old National re-alleges paragraphs 1-15 and 17-35 above as if set forth herein.

55.     The Accounts and data related to the Accounts constitute Old National's property.

56.     Goldberg LLC and Goldberg have committed an unauthorized act by exerting unauthorized control over the Accounts, thereby depriving Old National of its property permanently or for an indefinite amount of time.

57.     Goldberg LLC's and Goldberg's actions are inconsistent with Old National's ownership interest in the Accounts and the data related to the Accounts.

WHEREFORE, Old National asks the Court to enter judgment against Goldberg LLC and Steven Goldberg for compensatory damages, punitive damages, prejudgment interest, costs, and such further relief as this Court deems just under the circumstances.

## COUNT VI – FRAUDULENT INDUCEMENT

58.     Old National re-alleges paragraphs 1-35 above as if fully set forth herein.

59.     Goldberg LLC and Goldberg falsely represented to Old National and Old National's Agent that Goldberg LLC intended to pay the Purchase Price under the Purchase Agreement.

60.     Goldberg LLC and Goldberg knew that their representations to Old National were false when they made them.

61.     Goldberg LLC's and Goldberg's intent in making the subject representations was to induce Old National and Old National's Agent to provide them the unmasked, confidential and proprietary information relating to the Accounts.

62.     In reliance upon these representations, Old National executed the Purchase Agreement, and Old National's Agent provided the unmasked information relating to the Accounts.

63.     As a result of this reliance, Old National has suffered damages.


WHEREFORE, Old National demands judgment against Goldberg LLC and Steven Goldberg for compensatory damages, punitive damages, prejudgment interest, costs, and for such further relief as this Court deems just under the circumstances.

### COUNT VII – BREACH OF CONTRACT- (Confidentiality Agreement)

64.     Old National re-alleges paragraphs 1-15 and 17-35 above as if fully set forth herein.

65.     The Confidentiality Agreement constitutes a valid and enforceable contract.

66.     The parties to the Confidentiality Agreement intended that the Confidentiality Agreement primarily or directly benefit Old National or a class of parties of which Old National is a member.

67.     Goldberg LLC materially breached the Confidentiality Agreement by, among other things, disseminating confidential information related to the Accounts to third parties.

68.     Old National has suffered damages as a result of Goldberg LLC's material breach of the Confidentiality Agreement.

WHEREFORE, Old National demands judgment against Goldberg LLC and Steven Goldberg for preliminary injunction, injunction/specific performance, compensatory damages, prejudgment interest, attorneys' fees, costs, and for such further relief as this Court deems just under the circumstances.

## COUNT VIII – ACCOUNTING

69.     Old National re-alleges paragraphs 1-35 above as if fully set forth herein.

70.     Pursuant to the Purchase Agreement, Goldberg LLC was required to pay the Purchase Price to Old National.  Goldberg LLC has failed and refused to pay the Purchase Price.

71.     Despite its failure to pay the Purchase Price, Goldberg LLC and/or Goldberg obtained the confidential and proprietary consumer information that was the subject of the Purchase Agreement by improper means.

72.     Upon information and belief, Goldberg LLC and/or Goldberg have used that confidential and proprietary information for its or his own personal gain.  Old National is entitled to the profits that Goldberg LLC and/or Goldberg have obtained by the improper use of the information.

73.     As a result of the improper use of Old National's confidential and proprietary information, an accounting from Goldberg LLC and Goldberg is appropriate to determine the use, sale, collateralization, disposition and profits that have occurred and been obtained by Defendants and any other person, including any of their assignees.

WHEREFORE, Old National demands judgment for an accounting from Goldberg LLC and Steven Goldberg for any and all monies or other remuneration it or he has obtained through use of the confidential and proprietary information.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable.

January 24, 2008

Wendy D. Brewer (Fla. Bar No. 57746)
E-mail: wendy.brewer@btlaw.com
Telephone: (317) 236-1313
Facsimile: (317) 231-7433
Michael Gottschlich (Pending Pro Hac Vice)
E-mail: MGOTTSCH@BTLaw.com
Telephone: (317) 231-7834
Facsimile: (317) 231-7433
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204

Thomas Gallagher (Fla. Bar. No. 793574)
E-mail: thomas.gallagher@ruden.com
RUDEN MCCLOSKY, ET. AL.
P.O. Box 1900
Fort Lauderdale, FL 33302
Telephone (954) 527-6237
Facsimile (954) 333-4237

Dan Matlow (Fla. Bar No. 384666)
E-mail: daniel.matlow@ruden.com
RUDEN, MCCLOSKY, ET. AL.
200 E. Broward Blvd.
P.O. Box 1900
Fort Lauderdale, FL 33302
Telephone: (954) 527-2475
Facsimile: (954) 333-4075
Attorneys for Old National Bank

INDS02 SMURRAY 947601v2

FTL:2526235:1

# CONFIDENTIALITY AGREEMENT
### Portfolio Sales Offered Through Garnet Capital Advisors, LLC

**THIS CONFIDENTIALITY AGREEMENT** (the "Agreement") is made and agreed to by the undersigned ("you") in connection with your consideration of possible purchases of certain portfolios of debt ("Portfolios") from certain sellers (individually, a "Seller") offered through Garnet Capital Advisors, LLC ("Advisor") now and in the future.

Advisor, as Seller's agent, is prepared to furnish you certain information regarding various Portfolios which is nonpublic, confidential, or proprietary in nature (the "Evaluation Material"). As used herein the term "Seller" also includes all affiliates of each Seller unless the context otherwise requires. In consideration of furnishing you and your principals, directors, officers and employees, attorneys, co-investors, partners, agents, financing sources and advisors (collectively, your "Representatives") with the Evaluation Material, whether before, on, or after the date of this Agreement ("Agreement"), you agree to enter into this Agreement as follows:

1. **Evaluation Material.** The Evaluation Material includes Confidential Offering Memoranda and all other information that Advisor will furnish to you or has furnished to you or your Representatives, whether in writing, electronically (including granting you access to Evaluation Material over the internet) or orally, including all projections, memoranda, notes, analyses, compilations, studies and other documents (and copies or extracts thereof) whether prepared by you or others, which contain or reflect such information.

2. **Use of Evaluation Material.** The Evaluation Material will be used by you and your Representatives solely for the purpose of evaluating the Portfolios and will not be used by you or your Representatives for any other purpose. The Evaluation Material will be kept confidential by you except that the Evaluation Material, or portions thereof, may be disclosed to those of your Representatives who need to know such information for the purpose of evaluating the Portfolios. You hereby agree that you will require your Representatives to abide by the terms of this Agreement, having been informed of the nonpublic confidential proprietary nature of the Evaluation Material. You agree that you shall be responsible for any breach of the terms of this Agreement by any of your Representatives. For purposes hereof, Evaluation Material does not include information which (a) is or becomes generally available to the public other than as a result of a disclosure by you or your Representatives, (b) was available to you or any Representative on a nonconfidential basis prior to its disclosure by the Seller or on its behalf, (c) becomes available to you or any Representative on a nonconfidential basis from a person who is not known by you to be otherwise bound by a confidentiality agreement with respect to the information, or is not otherwise prohibited from transmitting the information to you or (d) is independently developed by you without reference to or reliance on the Evaluation Material.

3. **Disclosure of Evaluation Material as Required by Law.** In the event you or your Representatives are requested or required (by depositions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Evaluation Material, you agree that, if permitted by law, you will provide Seller prompt notice of such request or requirement. It is further agreed that you may disclose such information if in the reasonable opinion of counsel you are required by law to do so.

4. **Duplication of Evaluation Material.** You will not make copies of the Evaluation Material except as necessary to assist you in your evaluation of the transaction. Upon notice from Seller, you will destroy all copies of the Evaluation Material in your possession or in the possession of your Representatives. You may retain one copy of any such Evaluation Material as required by your document-retention policies to comply with applicable laws or regulations.



EXHIBIT "A"

# CONFIDENTIALITY AGREEMENT
## Portfolio Sales Offered Through Garnet Capital Advisors, LLC

5. **No Representations or Warranties.** You understand and acknowledge that neither Advisor nor Seller or their representatives have made or make any representation or warranty, express or implied, as to the accuracy or the completeness of the Evaluation Material and that neither Advisor nor Seller or their representatives shall have any liability to you or any other person resulting from your use of the Evaluation Material. Only those representations and warranties that are made to the purchaser pursuant to a Purchase and Sale Agreement, when and if it is executed, and subject to such limitations and restrictions as may be specified in such Purchase and Sale Agreement, shall have any legal effect.

6. **Disclosure of the Existence of Potential Transactions.** Without the prior written consent of Seller, you will not, and you will direct your Representatives not to, disclose to any person (except as otherwise permitted herein) the fact that the Evaluation Material has been made available to you, that discussions or negotiations are taking place concerning any Portfolio, the Seller or any of the terms, conditions or other facts with respect to any possible transaction, including the status thereof, unless in the reasonable opinion of your counsel you are required to make such disclosure by applicable law. The term "person" as used in this Agreement shall be broadly interpreted to include without limitation any corporation, company, partnership, firm, joint venture, association, other entity or individual.

7. **Contacting Borrowers, Guarantors and Related Parties.** You will not make contact with any borrower or guarantor under any of the assets in the Portfolio, nor with any affiliate, accountant, attorney, employee or any other related party to any borrower or guarantor, unless you have a prior existing business, collection or other relationship with such person. In such case, you may contact such person, but you will not make reference to any account or loan contained in a Portfolio, any Evaluation Materials, or to the fact that such account or loan has been offered for sale. If a sale transaction, if any, is consummated between you and the Seller with respect to a particular asset, you may then make contact with such parties related to the assets purchased in such consummated sale.

8. **Nonpublic Personal Information.** The parties understand and agree that Evaluation Material expressly includes nonpublic personal information ("NPI"). NPI has the meaning ascribed to Nonpublic Personal Information in Title V of the Gramm-Leach Bliley Act of 1999 or any successor federal statute and the rules and regulations thereunder, all as may be amended or supplemented from time to time (the "GLB Act"). Each party agrees to comply in all respects with the GLB Act and to protect the confidentiality of any NPI to which it is granted access. Notwithstanding any provision to the contrary, the parties agree that no NPI will be revealed to any other party for other than those legitimate purposes allowed under the GLB Act and any related federal or state laws, without the express written consent of the party providing such information at any time, now or in the future.

9. **Term.** This Agreement is for the benefit of Seller and shall become effective immediately upon your signing it. At any time you may notify Advisor in writing that you no longer wish to receive Evaluation Materials for future sales. At such time, Advisor will not provide any further Evaluation Materials to you, however any Evaluation Materials already received by you will continue to be subject to this Agreement.

10. **Governing Law.** This Agreement shall be governed, construed, and enforced, and all rights and obligations of the Seller and the undersigned shall be determined, in accordance with the laws of the State of New York without regard to its conflicts-of-laws principles.

# CONFIDENTIALITY AGREEMENT
## Portfolio Sales Offered Through Garnet Capital Advisors, LLC

The undersigned hereby agrees to the terms and conditions set forth in the foregoing Agreement.

Name of Entity: _Goldberg & Associates_   Address: _13073  Signature PT._
_#207_

By: _[signature]_

Name: _Steven Goldberg_                                _San Diego, CA. 92130_

Title: _Owner_                           Telephone: _858- 794-0420_
_858 - 692-4330 (cell)_

Fax:   _858- 794 -0425_

Date: _10/20/05_                          E-Mail: _sgoldberg1 @ san. RR. Com_

**Please indicate who should receive the Evaluation Materials (including the data file, offering materials and internet access):**

**Data File:**                                   **Offering Memo (hard-copy):**

Name: _Steve Goldberg_                       Name:

Company: _Goldberg & Assoc_                  Company:

Address: _13073  Signature PT_                Address: _Same_
_#207_

_San Diego  CA. 92130_

Telephone: _858-794-0420_                     Telephone:
_858 - 692- 4330 (cell)_

E-Mail: _SGoldberg1 @ San.RR.Com_            E-Mail:

**Internet Access to Evaluation Materials:**

Name:                                        E-Mail:

Name:   _Same_                               E-Mail:  _Same_

Name:                                        E-Mail:

Name:                                        E-Mail:

**this confidentiality agreement should be faxed to Tracy Higgins at (212) 881-9831**

PURCHASE AND SALE AGREEMENT

between

Old National Bank,

as Seller

– and –

Goldberg & Associates, LLC,

as Buyer

Dated and Effective as of

December 14, 2007



## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is entered into this 14th day of December, 2007, by and between Old National Bank, a national association with an office at One Main Street, Evansville, Indiana 47708 ("Seller") and Goldberg & Associates, LLC, a limited liability company with an office and principal place of business at 102 N.E. 2nd Street, Suite 387, Boca Raton, FL 33432 ("Buyer").

### W I T N E S S E T H :

WHEREAS, Seller desires to sell certain Accounts (as defined herein);

WHEREAS, Buyer has reviewed and evaluated, to Buyer's full satisfaction, the Accounts, and the documents and records relating to the Accounts made available by Seller; and

WHEREAS, Buyer was the successful bidder for purchase of the Accounts for the consideration and under the express terms, provisions, conditions and limitations as set forth herein; and

WHEREAS, Seller is willing, subject to the express terms, provisions, conditions, limitations, waivers and disclaimers as may be expressly set forth herein, to sell, transfer, assign and convey to Buyer all of Seller's right, title and interest, in, to and under the Accounts.

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

### ARTICLE I
### DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

**"Account"** means each and any of the charged-off consumer loan accounts identified on Exhibit A attached hereto and made a part hereof and to be sold by Seller to Buyer under the terms, conditions and provisions of this Agreement and includes for each of the Accounts identified on Exhibit A, all obligations owed to Seller from each Obligor with respect to each Account under or by virtue of the Evidence of Debt (including any deficiency thereunder), all rights, powers, liens or security interests of Seller with respect to any such Evidence of Debt, and the interest of Seller in any litigation or bankruptcy to which Seller is a party or claimant relating to any of the Accounts.

**"Account Balance"** means the unpaid principal balance owed on any individual Account as of the Cutoff Date and reflected on the Account Schedule. The Account Balance may also include pre-charge-off accrued interest and/or fees. It is possible that (i) payments may have been made by or on behalf of any Obligor on or prior to the Cutoff Date that are not reflected in the Account Balance, or (ii) the Account Balance may reflect payments made by or on behalf of an Obligor which have been deposited and credited to the balance of the Account, but which may subsequently be dishonored and thus returned to Seller. In either case, the Account Balance shall be adjusted post-closing to the extent discrepancies are later discovered, and Buyer shall be entitled to a partial refund of the Allocated Account Price as set forth in Section 2.5.

**"Account Documents"** means, to the extent available, the original or any copy (including any microfilm, microfiche, photocopy or machine-readable format) of (i) the application and/or account statements with respect to credit card accounts, or (ii) the Evidence of Debt with respect to consumer loan accounts.

"**Account Schedule**" means the schedule, in electronic form, attached hereto as <u>Exhibit A</u> and made a part hereof, setting forth the following information for each Account: the Account number, the name of primary Obligor, and the Account Balance.

"**Agreement**" means this Purchase and Sale Agreement, including the cover page and all Addenda, Exhibits and Schedules hereto.

"**Allocated Account Price**" means the individual price of any Account sold hereby which is calculated as the product of the Purchase Price Percentage and the Account Balance for such Account sold hereby.

"**Business Day**" means any day on which Seller is open for business other than a Saturday, a Sunday or a federal holiday.

"**Claim**" means any claim, demand or legal proceeding.

"**Closing Date**" means the date of this Agreement.

"**Computer File**" means the computer file or files to be sent by e-mail or Federal Express priority delivery by Seller to Buyer no later than one Business Days following the Closing Date. The file shall be in a mutually acceptable electronic format, and shall contain Account-specific information for each of the Accounts sold hereby. Seller will use its best efforts to ensure the accuracy and completeness of the data. The Computer File shall include, but shall not be limited to, the following fields to the extent available as of the Cutoff Date for each Account: (i) principal balance, (ii) payoff balance, (iii) account number, (iv) name, last known address and last known phone number of the primary Obligor (and co-borrowers or guarantors), (v) social security number of the primary Obligor (and co-borrowers or guarantors), (vi) date of last payment, (vii) last payment amount, (viii) interest rate, (ix) charge-off date, (x) open date, and (xi) last 12-month payment history by month (including, in some cases, application of sale proceeds).

"**Cutoff Date**" means midnight on November 20, 2007, on which date the Account Balances shall be determined for purposes of calculating the Purchase Price and Allocated Account Prices.

"**Embedded Settlement**" means a written arrangement whereby Seller or its servicing agent(s) has agreed to forgive a portion of the Account Balance if the Obligor makes an agreed-to number of payments within an agreed-to period of time.

"**Evidence of Debt**" means each promissory note or lease agreement, or other instrument evidencing an obligation to repay an Account and all supplements and amendments thereto, or, a copy thereof, certified by Seller as a true copy accompanied in the case of a copy of the original with a lost note affidavit.

"**Issuer**" means the entity which originated an Account, if Seller did not originate such Account.

"**Loan Sale Advisor**" means Garnet Capital Advisors, LLC.

"**Obligor**" means the current and unreleased obligor(s) on an Account including, without limitation, any and all co-makers, guarantors, judgment debtors or other persons or entities liable on the Account.

"**Prior Owner**" means the entity which owned the Account immediately preceding Seller, if applicable.

"**Purchase Price**" means the amount, in dollars, to purchase the Accounts as stated in <u>Section 2.4</u>, calculated by multiplying the aggregate Account Balances as shown on the Account Schedule by the Purchase Price Percentage.

"**Purchase Price Percentage**" means 1.00%.

"**Transfer Documents**" means the Bill of Sale and Assignment and such other documents as Seller and Buyer reasonably agree are necessary, proper or appropriate for the legal transfer of Seller's right, title and interest in and to the Accounts purchased pursuant to this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF THE ACCOUNTS

**Section 2.1**      **Agreement to Sell and Purchase Accounts.** Seller agrees to sell, and Buyer agrees to purchase, the Accounts described in the Account Schedule, subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement.

**Section 2.2**      **Agreement to Assign/Buyer's Right to Act.** On the Closing Date, or on the first Business Day following the Closing Date, Seller shall deliver to Buyer a Bill of Sale and Assignment, in the form of Exhibit B hereto, executed by an authorized representative of Seller, which Bill of Sale and Assignment shall sell, transfer, assign, set-over, quitclaim and convey to Buyer all right, title and interest of Seller in and to each of the Accounts sold and the proceeds of the Accounts received by Seller, if any, from and after the Cutoff Date. Buyer shall have no right to communicate with any Obligor or otherwise take any action with respect to any Account or any Obligor until after the Closing Date.

**Section 2.3**      **Account Schedule.** Seller has provided as Exhibit A hereto the Account Schedule setting forth all of the Accounts which Buyer has agreed to purchase and Buyer acknowledges that the same has been reviewed to its full satisfaction.

**Section 2.4**      **Purchase Price/Payment.** The Purchase Price for the Accounts is $294,435 which Buyer shall pay to Seller on or before 5:00 p.m. eastern time on the Closing Date. Such Purchase Price shall be paid to Seller in United States Dollars by wire transfer of immediately available funds to an account specified by Seller.

**Section 2.5**      **Payments Received/Adjustments to Purchase Price.** To the extent that Seller has received any payments or other consideration distributed or paid by or on behalf of an Obligor on or prior to the Cutoff Date, Seller has reduced the Account Balance of such Account for purposes of calculating the Purchase Price. Buyer shall be entitled to a refund of the Purchase Price Percentage times the payment amount to the extent such Account Balance did not reflect a reduction for such payment. In the event that there are Embedded Settlements not reflected in the Account Balances, Buyer shall additionally be entitled to a refund of the Purchase Price Percentage times the portion of the Account Balance that Seller or its agents had previously agreed to forgive if such Account Balance was not reduced prior to Closing to reflect such forgiven portion. Buyer shall not be entitled to such refund if the Obligor does not make the agreed-to payments within the agreed-to period of time such that the full Account Balance is again due and owing.

**Section 2.6.**      **Delivery of Post-Cutoff-Date Payments.** If Seller shall receive any payments or other consideration distributed or paid by or on behalf of any Obligor with respect to any Account after the Cutoff Date, Seller shall pay over and/or deliver such payments or other consideration to Buyer ((i) without interest thereon from Seller and (ii) less any commissions due to any third-party collection agencies or attorneys for payments received between the Cutoff Date and the Closing Date) on or within 30 days of receipt of such amounts and, if deemed necessary or appropriate by Seller, with an endorsement in the form substantially as follows: "Pay to the order of Goldberg & Associates, LLC without representations, warranties, and without recourse." Seller shall indicate on the records related to any of the Accounts transmitted to Buyer with the payment remittances the

account number, the date of receipt of the payment, the amount of the payment and any other detail reasonably required to allow Buyer to properly post the payments to its collection system. If Seller has deposited payments received from any Obligor and issues a check or payment therefor to Buyer, Buyer shall retain the risk that any such payment so deposited by Seller shall be returned due to insufficient funds. Seller shall have a period of 30 days after the date Seller delivers to Buyer payments made by or on behalf of any Obligor on or after the date of this Agreement, to notify Buyer in writing that any such payments were returned due to insufficient funds and specifying the amount thereof, whereupon Buyer shall immediately, and not later than 30 days following receipt of such notice, pay to Seller the amount of such payment by cashier's or certified check and identifying thereon this Agreement.

## ARTICLE III
## TRANSFER OF ACCOUNTS AND DOCUMENTS

Section 3.1  **Assignment of Accounts.**  On the Closing Date after confirmation by Seller of receipt of the payment of the balance of the Purchase Price, Seller shall execute and deliver or make available to Buyer the Transfer Documents.  The Bill of Sale and Assignment shall have the same effect as an individual and separate bill of sale and assignment of each and every Account referenced therein.  Buyer shall be responsible at its own expense for the recording and/or filing of the originals of any such assignments as it deems necessary or appropriate in its sole discretion.

Section 3.2  **Requests for Account Documents.**  Seller shall provide all Account Documents in its possession to Buyer within 45 days following the Closing Date.  Buyer shall be responsible for (i) shipping charges and (ii) for arranging shipping or pickup of the Account Documents.  Seller has estimated in good faith that it will be able to deliver Account Documents for at least 60% of the Accounts; however, it shall only be obligated to deliver those Account Documents that are in its possession and reasonably retrievable. Buyer acknowledges that Account Documents may not be available and Seller shall only be obligated to deliver Account Documents, if available, pursuant to the terms of this Section 3.2.

Section 3.3  **Pending Legal Proceedings.**  No Account sold hereunder is subject to any legal proceeding initiated by an Obligor as of the Closing Date.

Section 3.4  **Collection/Contingent Fees.**  No Account sold hereunder is subject to third-party collection or contingency fees as of the Closing Date, except that Accounts that have been recalled from third-party collection agencies may continue to have contingency fees due and payable for payments received during the recall period, in which case Seller shall remit payments to Buyer net of such third-party collection fees as described in Section 2.6.

Section 3.5  **Apportionment of Costs.**  Except as otherwise specifically provided in this Agreement, each party will be responsible for all fees, costs and expenses which it incurs in connection with the negotiation, execution, delivery and performance of this Agreement and the transactions contemplated hereby.

## ARTICLE IV
## SERVICING/COLLECTION

Section 4.1  **Servicing/Collection After Closing Date.** The Accounts shall be sold and conveyed to Buyer on a servicing-released basis.  As of the Closing Date, all rights, obligations,

liabilities and responsibilities with respect to the servicing of the Accounts shall pass to Buyer, and Seller shall be discharged from all servicing liability therefore.

**Section 4.2.** **Notification to Obligors.** Seller and Buyer acknowledge and agree that Buyer will make written notification to Obligors of the transfer of the Accounts to Buyer within thirty (30) days of the Closing Date and direct all future payments to be made to Buyer's address.

**Section 4.3** **Debt Collection of Accounts.** If Buyer collects or attempts to collect on an Account, Buyer and/or its agent will at all times:

    (a) comply with all state and federal laws applicable to debt collection including without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act and the Fair Debt Collection Practices Act;

    (b) for any Account where the statute of limitations has run, not falsely represent that a lawsuit will be filed if the Obligor does not pay; and

    (c) not charge any Obligor any charges which are unauthorized.

**Section 4.4** **Use of Seller's Name.** Buyer will not use or refer to the name of Seller (or Prior Owner or Issuer, if applicable) and will not portray itself as Seller's agent, partner, or joint venturer with respect to the Accounts, or as the agent, partner or joint venturer of Prior Owner or Issuer, if applicable. However, Buyer may use the name of Seller (and/or Issuer, if applicable) for purposes of identifying an Account in communications with the Obligors or in the caption of any litigation against Obligor (so long as it is apparent that Seller (or Prior Owner or Issuer, if applicable) are not set forth in such caption as the party plaintiff) in order to collect amounts outstanding on the Accounts. In contacting an Obligor, filing suit, or selling Accounts, Buyer will not state or represent in any way that Buyer is contacting the Obligor, filing suit or selling loans for or on behalf of Seller (or Prior Owner or Issuer, if applicable) or that any of the above will take any action with regard to the Account or the Obligor.

**Section 4.5** **Reporting to Credit Bureaus.** Seller will report the Accounts to the appropriate credit reporting agencies as sold/transferred. Except as required by law, Seller shall have no further obligation with respect to credit reporting.

**ARTICLE V**
**RESERVED**

**ARTICLE VI**
**SELLER'S OBLIGATION TO REPURCHASE ACCOUNTS**

**Section 6.1** **Accounts Affected.** Upon written notice from Buyer received no later than 90 days from the Closing Date, Seller will repurchase any Account to which any of the following conditions applies:

    (a) death of all Obligors on or prior to the Cutoff Date;

    (b) the filing of bankruptcy proceedings by all Obligors on or prior to the Cutoff Date without subsequent dismissal;

(c) the Account was created as a result of fraud or forgery such that all Obligors have no liability for such Accounts;

(d) on or prior to the Cutoff Date, Seller received payment in full settlement of the Account (including but not limited to issuance by Seller (or Prior Owner or Issuer, if applicable) of Form 1099C), but which was not deleted from the Account Schedule by Seller;

(e) the Account is a duplicate record of any other Account being sold hereby;

(f) the Account is subject to a third-party contingency fee agreement that cannot be cancelled; or

(g) the Obligor has initiated litigation against Seller, any Prior Owner or Issuer.

**Section 6.2**  **Procedure for Account Repurchase.**  For any Account which meets a condition set forth in Section 6.1, Buyer will reassign such Account to Seller. Buyer will immediately cease releasing, collecting, or compromising the Account after Buyer notifies Seller that such Account is subject to this Article VI. Buyer shall promptly remit to Seller any payments received on such Account from and after the date that Buyer notifies Seller that such Account is subject to this Article VI.

Seller shall refund to Buyer the Allocated Account Price for such Account, less any amounts collected by Buyer after the Cutoff Date and prior to Buyer's notification to Seller that the Account is subject to this Article VI. The repurchase price shall be paid to Buyer within fourteen (14) days after Seller's receipt of the documents and instruments required to reassign such Account to Seller.

**Section 6.3**  **Limitation of Buyer's Right to Require Repurchase.**  Seller is not and shall not be obligated to repurchase any Account as to which:

(a) the terms have been modified in any material respect by a written or oral agreement between Buyer and Obligor;

(b) Buyer has obtained full payment on the Account from Obligor or any guarantor or surety therefor, or otherwise accepted partial payment thereof in full satisfaction of the debt evidenced thereby;

(c) any of the Obligors have been released by Buyer; or

(d) Buyer has not provided evidence or proof reasonably satisfactory to Seller that the conditions set forth in Section 6.1 are met.

## ARTICLE VII
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants and covenants, as of the date of this Agreement and as of the Closing Date as follows:

**Section 7.1**  **Independent Evaluation.** Buyer is a sophisticated investor, has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of the transaction contemplated by this Agreement, and that its bid for and decision to purchase the Accounts pursuant to this Agreement is and was based upon Buyer's own

independent evaluation of information deemed relevant to Buyer, and of the information made available by Seller or Seller's personnel, agents, representatives or independent contractors to Buyer, which Buyer acknowledges and agrees were made available to it and which it was given the opportunity to inspect to its complete satisfaction. Buyer has relied solely on its own investigation and has not relied upon any oral or written information provided by Seller or its personnel, agents, representatives or independent contractors other than those representations and warranties contained in this Agreement. Buyer acknowledges and agrees that no employee, agent, representative or independent contractor of Seller has been authorized to make, and that Buyer has not relied upon, any statements other than those specifically contained in this Agreement. Buyer acknowledges that Seller has attempted to provide accurate information to all prospective bidders but that Seller does not represent, warrant or insure the accuracy or completeness of any information or its sources of information contained in the materials submitted to Buyer. Buyer has made such independent investigations as it deems to be warranted into the nature, validity, enforceability, collectibility, and value of the Accounts, and all other facts it deems material to its purchase and is entering into this transaction solely on the basis of that investigation and Buyer's own judgment.

**Section 7.2**    **Authorization.** Buyer is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

**Section 7.3**    **Binding Obligations.** This Agreement and all of the obligations of Buyer hereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

**Section 7.4**    **No Breach or Default.** The execution and delivery of this Agreement and the performance of its obligations hereunder by Buyer will not conflict with any provision of any law or regulation to which Buyer is subject or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Buyer is a party or by which it is bound or any order or decree applicable to Buyer, or result in the violation of any law, rule, regulation, order, judgment or decree to which Buyer or its property is subject.

**Section 7.5**    **Accounts Sold As Is.** BUYER ACKNOWLEDGES AND AGREES THAT ALL ACCOUNTS, ALL DOCUMENTATION, INFORMATION, ANALYSIS AND/OR CORRESPONDENCE, IF ANY, ARE SOLD, TRANSFERRED, ASSIGNED AND CONVEYED TO BUYER ON AN "AS IS, WHERE IS" BASIS, WITH ALL FAULTS, EXCEPT AS PROVIDED HEREIN. BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT AND DOES NOT REPRESENT, WARRANT OR COVENANT THE NATURE, ACCURACY, COMPLETENESS, ENFORCEABILITY OR VALIDITY OF ANY OF THE ACCOUNTS, AND/OR THE ACCOUNT DOCUMENTS, EXCEPT AS PROVIDED HEREIN.

**Section 7.6**    **Pending Litigation.** There is no proceeding, action, investigation or litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to

be taken in connection with Buyer's obligations contemplated herein, or which would be likely to impair materially its ability to perform under the terms of this Agreement.

**Section 7.7**   **Approvals and Notices.** No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Buyer with this Agreement or the consummation of any other transaction contemplated hereby.

**Section 7.8**   **Economic Risk.** The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the transactions involve any "security" or "securities". Buyer acknowledges, understands and agrees that the acquisition of these Accounts involve a high degree of risk and are suitable only for persons or entities of substantial financial means who have no need for liquidity and who can hold the Accounts indefinitely or bear the partial or entire loss of the value.

**Section 7.9**   **Nondisclosure.** Buyer is in full compliance with its obligations under the terms of any confidentiality agreement executed by Buyer to review the information made available by Seller or its personnel, agents, representatives or independent contractors to all potential bidders for the Accounts. Furthermore, Buyer shall keep the terms of the Agreement confidential, including that fact that it has purchased the Accounts from Seller.

**Section 7.10**  **Contact with Issuer/Prior Owner.** Buyer and its assignees shall not contact or have its agents contact, directly or indirectly, the Issuer or Prior Owner (if applicable) without written permission from Seller. Notwithstanding written permission, Buyer agrees to insert a provision prohibiting contact with Issuers or Prior Owners in any agreement of purchase in the event Buyer transfers any of the Accounts.

**Section 7.11**  **Identity.** Buyer is a "United States person" within the meaning of Paragraph 7701(a)(30) of the Internal Revenue Code of 1986, as amended.

**Section 7.12**  **Enforcement/Legal Actions.** Buyer shall not institute any enforcement or legal action or proceeding in the name of Seller (or Issuer or Prior Owner, if applicable), or any subsidiary thereof. Buyer shall not make reference to any of the foregoing entities in any correspondence to or discussion with any particular Obligor regarding enforcement or collection of the Accounts, except to identify the subject debt as set forth in <u>Section 4.4</u>. Buyer will comply in all respects with all applicable laws including, but not limited to, those relating to debt collection practices, in connection with the Accounts and not to take any enforcement action against any Obligor which would be commercially unreasonable and that Buyer will not misrepresent, mislead, deceive, or otherwise fail to adequately disclose to any particular Obligor the identity of Buyer as the owner of the Accounts. Buyer agrees, acknowledges, confirms and understands that there may be no adequate remedy at law for a violation of the terms, provisions, conditions and limitations set forth in this <u>Section 7.12</u> and Seller shall have the right to seek the entry of an order by a court of competent jurisdiction enjoining any violation hereof.

**Section 7.13**  **Status of Buyer.** Buyer is a sophisticated purchaser that is in the business of buying or originating or collecting Accounts of the type being purchased or that otherwise deals in such Accounts in the ordinary course of Buyer's business.

**Section 7.14**    **DTPA Waiver.** Buyer has knowledge and experience in financial and business matters that enables Buyer to evaluate the merits and risks of the transactions contemplated hereby. Further, Buyer is not in a disparate bargaining position relative to Seller. Buyer hereby waives, to the maximum extent permitted by law, any and all rights, benefits and remedies under any state deceptive or unfair trade practices/consumer protection act, with respect to any matters pertaining to this Agreement and the transactions contemplated hereby.

**Section 7.15**    **No Collusion.** Neither Buyer, its affiliates, nor any of their respective officers, partners, agents, representatives, employees or parties in interest (i) has in any way colluded, conspired, connived or agreed directly or indirectly with any other bidder, firm or person to submit a collusive or sham bid, or any bid other than a bona fide bid, in connection with the sale resulting in Buyer being the highest bidder for the Accounts subject to this Agreement, or (ii) has, in any manner, directly or indirectly, sought by agreement or collusion or communication or conference with any other bidder, firm or person to fix the price or prices, or to fix any overhead, profit or cost element of the bid price or the bid price of any other bidder at the sale resulting in Buyer being the highest bidder for the Accounts subject to this Agreement, or to secure any advantages against Seller.

**Section 7.16**    **Broker.** Buyer has not engaged any broker or agent in connection with this Agreement or the transactions contemplated by this Agreement or to which this Agreement relates and Buyer covenants to defend with counsel approved by Seller and hold harmless and indemnify Seller from and against any and all costs, expense or liability for any compensation, commissions and charges claimed against Seller by any broker or agent based upon a written agreement with Buyer relating to this Agreement or the transactions contemplated herein.

**Section 7.17**    **Survival.** The representations and warranties set forth in this Article VII shall survive the closing of the transactions herein contemplated.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents, warrants and covenants, as of the date of this Agreement and as of the Closing Date as follows:

**Section 8.1**    **Authorization.** Seller is duly and legally authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject and that the undersigned representative is authorized to act on behalf of and bind Seller to the terms of this Agreement.

**Section 8.2**    **Binding Obligations.** This Agreement and all of the obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

**Section 8.3**    **No Breach or Default.** The execution and delivery of this Agreement and the performance of its obligations hereunder by Seller will not conflict with any provision of any law or regulation to which Seller is subject or conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or

instrument to which Seller is a party or by which it is bound or any order or decree applicable to Seller, or result in the violation of any law, rule, regulation, order, judgment or decree to which Seller or its property is subject.

**Section 8.4**   **Title to Accounts.**  Seller is the lawful holder of the Accounts and is duly and legally authorized to sell, transfer, convey and assign its rights therein. Seller has not made any prior assignment, conveyance, transfer or sale of any of its rights or interests in the Accounts.

**Section 8.5**   **Compliance with Law.**  The Accounts have been originated, serviced and collected in accordance with all applicable laws, and the Accounts are valid, legally enforceable debt, due and owing from each Obligor.

**Section 8.6**   **Consent.**  If applicable and required, Seller has obtained proper consent from all Prior Owners or Issuer requiring consent to sell and assign the Accounts to Buyer.

**Section 8.7**   **Broker.**  Seller has not engaged any broker or agent in connection with this Agreement or the transactions contemplated by this Agreement or to which this Agreement relates except Loan Sale Advisor for whose fees Seller shall be solely responsible in accordance with its agreement with Loan Sale Advisor and Seller covenants to defend with counsel approved by Buyer and hold harmless and indemnify Buyer from and against any and all costs, expense or liability for any compensation, commissions and charges claimed against Buyer by any broker or agent based upon a written agreement with Seller relating to this Agreement or the transactions contemplated herein.

**Section 8.8**   **Survival.**  The representations and warranties set forth in this Article VIII shall survive the closing of the transactions herein contemplated.

EXCEPT FOR THOSE EXPRESSED IN THIS ARTICLE VIII, NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, HAVE BEEN MADE BY SELLER OR BY ANYONE ACTING ON ITS BEHALF.  WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, NO WARRANTIES OR REPRESENTATIONS HAVE BEEN MADE OR ARE MADE REGARDING (i) THE COLLECTIBILITY OR ENFORCEABILITY OF ANY THE ACCOUNTS, (ii) THE CREDITWORTHINESS OF ANY OBLIGOR WITH RESPECT TO ANY OF THE ACCOUNTS, OR (iii) THE VALUE OF ANY COLLATERAL SECURING PAYMENT OF ANY INDEBTEDNESS UNDER ANY OF THE ACCOUNTS.

## ARTICLE IX
## INDEMNIFICATION

**Section 9.1**   **Buyer's Indemnification.**  From and after the date of this Agreement, Buyer shall indemnify and hold Seller harmless against and from any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature asserted by any third party (herein "claims") including, without limitation, all reasonable expenses incurred by Seller in investigating, preparing or defending against any such claims and reasonable attorneys' fees both for such defense and all costs and expenses incurred by Seller to enforce this indemnification, which Seller shall incur or suffer as a result of:

    (i)    the material inaccuracy of any of Buyer's representations or warranties herein,

    (ii)   the material breach of any of Buyer's covenants herein, or

(iii) any claim by any Obligor regarding assignment, subsequent enforcement, servicing or administration of the Accounts by Buyer or Buyer's agents.

The obligations of Buyer under this <u>Article IX</u> shall survive the closing of the transactions herein contemplated.

**Section 9.2**   <u>**Seller's Indemnification.**</u>   From and after the date of this Agreement, Seller shall indemnify and hold Buyer harmless against and from any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature asserted by any third party (herein "claims") including, without limitation, all reasonable expenses incurred by Buyer in investigating, preparing or defending against any such claims and reasonable attorneys' fees both for such defense and all costs and expenses incurred by Buyer to enforce this indemnification, which Buyer shall incur or suffer as a result of:

(i)   the material inaccuracy of any of Seller's representations or warranties herein,

(ii)   the material breach of any of Seller's covenants herein, or

(iii)   any claim by any Obligor regarding the origination, servicing, collection or administration of the Accounts by Seller or Seller's agents.

The obligations of Seller under this <u>Article IX</u> shall survive the closing of the transactions herein contemplated for a period of three (3) years.

**Section 9.3**   <u>**Procedure for Indemnification.**</u>   Any party seeking indemnification with respect to a claim or loss shall give prompt written notice thereof to the party against whom indemnification is sought. Indemnitor shall have the right to assume the defense of any and all claims for which indemnification is sought hereunder, and indemnitee agrees to cooperate with indemnitor in any such defense. If the amount of any claim or loss shall, at any time subsequent to payment pursuant to this Agreement, be reduced by recovery, settlement or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the indemnitee to the related indemnitor.

## ARTICLE X
## RESALE OF ACCOUNTS

Except as set forth in this <u>Article X</u>, Buyer may not assign any rights under this Agreement to any person or entity without the express prior written consent of Seller.

**Section 10.1**   <u>**Notice.**</u>   If Buyer wishes to resell or transfer any of the Accounts to a third party (including without limitation, any of Buyer's affiliated companies), Buyer must give Seller at least 10 days' prior written notice of Buyer's desire to transfer. Buyer's notice will:

(a) identify the Account(s) that Buyer wishes to resell or transfer; and

(b) identify by name and address each third party that potentially would purchase or otherwise receive the Account(s) from Buyer.

Notwithstanding the above, Buyer may sell the Accounts to one or more of its directly or indirectly wholly-owned entities or to one or more trusts established by such entities or pledge or create a security interest in the Accounts to or for a lender as collateral for a loan.

**Section 10.2**    **Approval.** Seller shall have the right to approve of such resale or transfer within the 10-day period to an assignee that is reasonably acceptable to Seller. Seller's approval shall not be unreasonably withheld.

**Section 10.3**    **Assignment.** If Buyer sells or transfers an Account to a third party, Buyer must assign to that third party all of Buyer's obligations under this Agreement, and Buyer's purchaser or transferee must accept the assignment, and expressly assume such Accounts in a writing which specifically indicates that Seller is an intended beneficiary thereof. Seller shall not be obligated in any way to a third party who acquires or purports to have acquired any of the Accounts. Any resale or assignment of Accounts without concurrent assignment of Buyer's obligations under this Agreement will be void.

**Section 10.4**    **Communication with Seller.** Any approved third-party to whom Buyer transfers accounts shall not have the right to contact Seller directly. Buyer shall remain Seller's counterpart and any communications between any such approved third-party transferees and Seller shall go through Buyer as the intermediary. Seller shall have the right, but not the obligation, to contact any third-party transferee directly if it receives collection complaints from any Obligor. In such case, Seller will notify Buyer of its direct communication with such third-party transferee.

**Section 10.5**    **Liability.** No sale or transfer of any Account by Buyer to a third party will relieve Buyer of any of its obligations or liabilities under this Agreement.

**ARTICLE XI**
**FILES AND RECORDS**

**Section 11.1**    **Conformity to Law.** Buyer agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling and maintenance of all Accounts and all documents and records relating to the Accounts purchased hereunder including, but not limited to, the length of time such documents and records are to be retained and making any disclosures to Obligors as may be required by law.

**Section 11.2**    **Inspection by Seller.** After the transfer of Account Documents to Buyer pursuant to the terms of this Agreement, Buyer agrees that Seller shall have the continuing right to use, inspect, and make extracts from, or copies of, any such Account Documents upon Seller's reasonable notice to Buyer, provided Buyer may legally share such information.

**ARTICLE XII**
**NOTICES**

Unless otherwise provided for herein, notices and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered but no later than the second Business Day following mailing sent by overnight mail or overnight courier, (b) when delivered, if sent by facsimile and receipt is confirmed by telephone, or (c) when received, if sent by e-mail and an e-mail confirming receipt is sent by the recipient, in each case to the parties at the following addresses (or at such other addresses as shall be specified by like notice):

If to Seller:

Old National Bank
One Main Street
Evansville, IN 47708
Attn: Kevin Blaylock
Tel: (812) 464-1355
Fax: (812) 465-0657
E-Mail: kevin_blaylock@oldnational.com

with a copy to:

Old National Bank
One Main Street, Evansville, IN 47708
Attn: Chief Legal Counsel
Fax (812) 468-0399

If to Buyer:

Goldberg & Associates, LLC
102 N.E. 2nd Street Suite 387
Boca Raton, FL 33432
Attn: Client Services Dept.
Tel: (561) 368-7304
Fax: (561) 392-5828

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

**Section 13.1**   **Severability.** If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

**Section 13.2**   **Rights Cumulative; Waivers.** The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth. The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right. Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

**Section 13.3**   **Headings.** The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**Section 13.4**   **Construction.** Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

**Section 13.5**   **Binding Effect.**   Subject to Article X, this Agreement and the terms, covenants, conditions, provisions, obligations, undertakings, rights and benefits hereof, including the Addenda, Exhibits and Schedules hereto, shall be binding upon, and shall inure to the

benefit of, the undersigned parties and their respective heirs, executors, administrators, representatives, successors, and assigns.

**Section 13.6**  **Prior Understandings.** This Agreement supersedes any and all prior discussions and agreements between Seller and Buyer with respect to the purchase of the Accounts and other matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

**Section 13.7**  **Integrated Agreement.** This Agreement and all Addenda, Exhibits and Schedules hereto constitute the final complete expression of the intent and understanding of Buyer and Seller. This Agreement shall not be altered or modified except by a subsequent writing, signed by Buyer and Seller.

**Section 13.8**  **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and either party hereto may execute this Agreement by signing any such counterpart.

**Section 13.9**  **Non-Merger/Survival.** Each and every covenant hereinabove made by Buyer or Seller shall survive the delivery of the Transfer Documents and shall not merge into the Transfer Documents, but instead shall be independently enforceable.

**Section 13.10**  **Governing Law/Choice of Forum.** This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the law of the State of Indiana, without giving effect to any choice of law principles. Buyer unconditionally and irrevocably consents to submit to the exclusive jurisdiction of the courts of the State of Indiana and of the United States District Court for the District of Southern Indiana, Evansville Division, for any actions, suits or proceedings arising out of or related to this Agreement (and Buyer agrees not to commence any action, suit or proceeding relating thereto except in such courts) and Buyer further agrees that service of any process, summons, notice or document by certified mail to Buyer's address as set forth herein shall be effective service of process for any action, suit or proceeding brought against Buyer in such court. In the event of litigation under this Agreement, the prevailing party shall be entitled to an award of attorneys' fees and costs.

**Section 13.11**  **No Third-Party Beneficiaries.** This Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

**Section 13.12**  **UCC Filings by Buyer.** Immediately upon the sale of the Accounts to Buyer from Seller on the applicable Closing Date and at any time thereafter, Buyer may file, in each appropriate office any UCC financing statement, and any amendments or any continuation statements thereto, required to perfect the sale of Accounts by Seller to Buyer.

**Section 13.13**  **Limited Power of Attorney.** Seller hereby grants, and shall execute and deliver, to Buyer a Limited Power of Attorney in the form of _Exhibit C_.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

**OLD NATIONAL BANK**

By: Kevin Blaylock

Its AVP, COLLECTION MANAGER
Duly Authorized

**GOLDBERG & ASSOCIATES, LLC**

By: Steve Goldberg
Its Managing Partner
Duly Authorized

**EXHIBIT A**

**ACCOUNT SCHEDULE**

**Summary of Accounts Sold:**

Aggregate Balances: $29,443,453
Number of Accounts: 8,779

LIST OF ACCOUNTS TO BE ATTACHED

*REFER TO ATTACHED CD*

**EXHIBIT B**
**BILL OF SALE AND ASSIGNMENT OF ACCOUNTS**

Old National Bank, a national association organized under the laws of the United States with an office at One Main Street, Evansville, Indiana 47708 ("Seller") hereby absolutely sells, transfers, assigns, sets-over and conveys to Goldberg & Associates, LLC, a limited liability company organized under the laws of the state of Florida with an office at 102 N.E. 2nd Street, Suite 387, Boca Raton, FL 33432 ("Buyer") without recourse and without representations or warranties, express or implied, of any type, kind or nature except as set forth in the Agreement (hereinafter defined):

(a) all of Seller's right, title and interest in and to each of the Accounts identified in the Account schedule attached hereto as Exhibit A (the "Accounts"), and

(b) all principal, interest or other proceeds of any kind with respect to the Accounts, but excluding any payments or other consideration received by or on behalf of Seller on or prior to November 20, 2007, with respect to the Accounts.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase and Sale Agreement made and entered into by and between Seller and Buyer dated December 14, 2007, (the "Agreement"). The Accounts are defined and described in the Agreement and are being conveyed hereby subject to the terms, conditions and provisions set forth in the Agreement.

This Bill of Sale shall be governed by the laws of the State of Indiana without regard to the conflicts-of-laws rules thereof.

DATED: December 14, 2007

SELLER:

By: _____
Name: _____
Title: _____

STATE OF _____ )
) ss.
COUNTY OF _____ )

On this the 14th day of December, 2007, before me the undersigned officer, personally appeared _____, who acknowledged him/herself to be the _____ of _____, a _____ corporation, signer and sealer of the foregoing instrument, and that he/she as such officer, being authorized so to do, acknowledged the execution of the same to be his/her free act and deed as such officer and the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand.

_____
Commissioner of the Superior Court
    Notary Public

**EXHIBIT C**
**LIMITED POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that Old National Bank, a national association organized under the laws of the United States ("Seller"), with respect to those certain purchased Accounts, described in that certain Purchase and Sale Agreement dated December 14, 2007 (the "Agreement") between Seller and Goldberg & Associates, LLC, a limited liability company organized under the laws of the state of Florida ("Buyer"), hereby names, constitutes and appoints Buyer, or any of its authorized agents, employees or representatives, its duly authorized attorney and agent with limited power and authority as it relates to the Accounts to (i) endorse checks and other negotiable instruments which may be received by Buyer; (ii) perfect, maintain, and release any security interests; (iii) transfer and obtain any titles, evidence of ownership or Account Documents; (iv) settle any insurance claims or litigation and apply for any insurance, warranty or sales tax refunds; and (v) to perform any and all acts relating to the Accounts which the undersigned was entitled to do as the owner of said Accounts. Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Agreement.

EXECUTED this 14th day of December, 2007

Seller: Old National Bank

By: _____
Name:
Title:


STATE OF _____)
) ss.
COUNTY OF _____        )

On this the 14th day of December, 2007, before me the undersigned officer, personally appeared _____, who acknowledged him/herself to be the _____ of _____, a _____ corporation, signer and sealer of the foregoing instrument, and that he/she as such officer, being authorized so to do, acknowledged the execution of the same to be his/her free act and deed as such officer and the free act and deed of said corporation.

IN WITNESS WHEREOF, I hereunto set my hand.


_____
Commissioner of the Superior Court
    Notary Public

JS 44
(Rev. 11/05)

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED by ___ D.C.
INTAKE

JAN 24 2008

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. – FT. LAUD.

**CIV - MIDDLEBROOKS**

**MAGISTRATE JUDGE**
**JOHNSON**

**I. (a) PLAINTIFFS**

OLD NATIONAL BANK,

**DEFENDANTS**

GOLDBERG & ASSOCIATES, LLC and STEVEN D. GOLDBERG,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Broward
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Thomas K. Gallagher, Esq., Daniel W. Matlow, Esq.
Ruden, McClosky, Smith, Schuster & Russell, P.A.
200 East Broward Boulevard, Suite 1500, FT. Lauderdale, FL  33301
(954) 527-6237 / (954) 333-4237(Fax)

ATTORNEYS (IF KNOWN)

**08-80078**

9:08 CV 80078 - DMM - Johnson

**(d)** Check County Where Action Arose: ☐ Miami-Dade ☐ Monroe ☐ Broward ☒ Palm Beach ☐ Martin ☐ St. Lucie ☐ Indian River ☐ Okeechobee Highlands

| **II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY) | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX ONLY) |
|---|---|

II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

1 ☐ U.S. Government
Plaintiff

2 ☐ U.S. Government
Defendant

3 ☐ Federal Question
(U.S. Government Not a Party)

4 ☒ Diversity
(Indicate Citizenship of
Parties in Item III)

III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX ONLY)
(For Diversity Cases Only)     FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☒1 | Incorporated or Principal Place of Business in This State | ☐4 | ☒4 |
| Citizen of Another State | ☒2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☒5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. NATURE OF SUIT** (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Med Malpractice | ☐ 620 Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 630 Liquor Laws | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholder's Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395 ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 863 DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 Habeas Corpus | ☐ 791 Empl. Ret. Inc. Security Act. | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 540 Mandamus & Other | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 550 Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | | | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | | | | |

**V. ORIGIN** (PLACE AN x IN ONE BOX ONLY)

☒1 Original Proceeding
☐2 Removed from State Court
☐3 Re-Filed
☐4 Reinstated or Reopened
☐5 Transferred from another district (specify)
☐6 Multidistrict Litigation
☐7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S)**
(See Instructions second page):

a) Re-filed Case ☐ YES ☒ NO     b) Related Cases ☐ YES ☒ NO

JUDGE _____   DOCKET NUMBER: _____

**VII. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C § 1332

Estimated days to try case (both sides) 4

**VIII. REQUESTED IN COMPLAINT:**

CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $

JURY DEMAND: ☒ Yes ☐ No
Check YES only if demanded in complaint:

SIGNATURE OF ATTORNEY OF RECORD  *Del W Matlow*

DATE  01/23/08

350⁰⁰     Receipt #542116

FTL:2526368:1